**SIGNED this 21st day of April, 2008.**

_____

**LEIF M. CLARK**
**UNITED STATES BANKRUPTCY JUDGE**

_____

# United States Bankruptcy Court

**Western District of Texas**
**El Paso Division**

| | |
|---|---|
| IN RE | BANKR. CASE NO. |
| PAN AMERICAN GENERAL HOSPITAL, LLC | 07-30935-LMC |
| _DEBTOR_ | CHAPTER 11 |

### MEMORANDUM OPINION REGARDING THE AMENDED JOINT MOTION OF U.S. BANK ENTITIES FOR DISTRIBUTION OF SALE PROCEEDS

CAME ON for hearing on April 3, 2008, the foregoing motion (the "Motion"), filed by Lyon Financial Services, Inc. d/b/a U.S. Bank Portfolio Services ("U.S. Bank"). The debtor commenced the instant bankruptcy case on August 6, 2007. U.S. Bank is a secured creditor in this case and was also a secured creditor in the debtor's previous chapter 11 case (the "First Case"). Even though U.S. Bank was under-secured in the First Case, it is now an over-secured creditor in this case, the result of an auction sale that yielded a better than originally anticipated outcome. It now seeks recovery of attorneys' fees under section 506(b) of the Bankruptcy Code.[1]

Several parties have objected to the Motion under two basic theories. First, the Official

---

[1] _See_ 11 U.S.C. §§ 101 et Seq. (2007).

Committee of Unsecured Creditors and one party in interest contend that the effect of confirmation of the plan in the First Case discharged U.S. Bank's right to recover fees and costs from the proceeds of the sale of its collateral in the present case. Second, the debtor objects to the reasonableness of the fees requested. The primary question presented to the court is whether an under-secured creditor, whose claim is modified by a plan of reorganization in one case, may subsequently become over-secured on the same modified claim, secured by the same collateral, such that it may request fees and expenses incurred just prior to and during the course of a subsequent case. For the reasons that follow, the court answers this question in the affirmative and concludes that the objections should be overruled and the Motion granted.

## BACKGROUND

Although U.S. Bank is the sole movant, the Motion is filed "jointly" because U.S. Bank serves in several capacities in this bankruptcy case. First, it is the servicer for DVI Receivables XV, LLC and agent for U.S. Bank, N.A., as trustee ("DVI-XV"); and second, it serves as the successor servicer for DVI Receivables XVII, LLC and agent for U.S. Bank, N.A., as trustee ("DVI-XVII" and, collectively the "DVI Entities"). In 1998, an entity known as Desert Healthcare, Ltd ("Desert Healthcare") executed a promissory note in favor of the DVI Entities, in the original principal amount of $3,000,000 (the "1998 Note"). The DVI Entities secured their rights to payment under the 1998 Note through a Deed of Trust, Security Agreement, Financing Statement and Rental Assignment (the "Deed of Trust"). The Deed of Trust granted the DVI Entities a lien on the hospital property, which included the land, building, and some but not all of the hospital equipment.[2]

---

[2] As set forth more thoroughly below, the debtor acquired the hospital subject to the Deed of Trust. As will also be discussed in greater detail *infra*, the relevant rights granted by the Deed of Trust were not modified by the debtor's confirmed plan in the First Case.

The hospital's fortunes were evidently star-crossed, because Desert Healthcare filed for bankruptcy protection. Pan American General Hospital was formed to acquire the hospital out of that bankruptcy case. In so doing, it assumed Desert Healthcare's obligations under the 1998 Note. Just two years later, in 2003, Pan American filed its own bankruptcy, which ultimately concluded with the confirmation of a plan of reorganization (the "Plan") in 2005. Things did not go well, however, and the debtor filed this case in 2007.

Because Pan American had assumed Desert Healthcare's obligations under the 1998 Note, U.S. Bank (on behalf of the DVI Entities) was a secured creditor of the estate in Pan American's First Case. The relevant provisions of the confirmed Plan bifurcated the DVI Entities' claims according to the types of collateral which secured the underlying obligations.[3] DVI-XVII, the holder of the claim with which we are primarily concerned in this decision, retained its lien on the land, building, and non-leased equipment (the collateral securing that obligation), and the Plan bifurcated its claim, treating its claim with respect to the collateral as an allowed secured claim under Class 4a, valued at $1.2 million. That claim was (of course) impaired. By the terms of the Plan, the debtor agreed to satisfy DVI-XVII's Class 4a secured claim by paying the principal amount, $1.2 million, in equal monthly payments over five years with a fixed rate of interest. The remainder of DVI-XVII's claim was treated along with other general unsecured claims in Class 7 of the Plan.

DVI-XV, the other claim holder whose claim is serviced by U.S. Bank, had a lien on certain radiology equipment, which was owned by a separate entity known as SWGH Rep El Paso, L.P.

---

[3] For reasons unimportant to this opinion, the DVI Entities were broken down into separate entities through their own bankruptcy filings prior to the confirmation of the debtor's Plan in the First Case. Apparently, upon the separation of the DVI Entities, so ended the cross-collateralization of the obligations owed them by the debtor. The Plan thus recognized this segregation and, for reasons discussed more fully below, the Plan's treatment of the DVI Entities' claims proves critical to the present Motion.

("SWGH") and leased back to the debtor.[4]  The Plan in the First Case did not impair DVI-XV's

claim.  DVI-XV simply retained its lien and its claim was satisfied by scheduled monthly base rent

payments through the end of the year 2008.[5]

When the debtor commenced the present case, neither of the DVI Entities' claims had yet

been fully satisfied.  U.S. Bank, therefore, filed proofs of claims on behalf of both DVI-XV and DVI-

XVII in the current bankruptcy case.  *See* Claim Nos. 179, 180.  This decision focuses solely on U.S.

Bank's request for attorneys' fees with respect to the DVI-XVII claim.  Thus, for purposes of this

decision, we will refer simply to the secured claim of U.S. Bank, by which we mean the allowed

secured claim of DVI-XVII that resulted from the Class 4a Plan treatment of the secured portion of

that entity's claim in the First Case, secured by land and building, and currently being serviced by

U.S. Bank.  For that claim (Claim No. 179), U.S. Bank asserts a total allowed secured claim in this

case of $1,174,234.40.[6]  U.S. Bank also seeks post-petition interest and reasonable attorneys' fees,

---

[4] In fact, SWGH was organized for just this purpose.

[5] *See* Plan at 24.  "Monthly base rent payments are $1,000 each for March, April, and May, 2004; $17,593.00 per month for June, July, and August, 2004; and $44,017.00 per month for the 54 months thereafter . . . ."  *Id.*  U.S. Bank alleged a principal balance of $2,118,115.85 for DVI-XV's claim, based on the terms of the loan agreement that existed pre-petition in the First Case, plus an additional $102,728.82 for interest accrued from May 1, 2007 until the date of the petition in the present case. See Claim No. 180.  As discussed further below, however, DVI-XV accepted $400,000 from the sale proceeds at closing.  DVI-XV seeks no further distributions from the proceeds of the sale, and, thus, this opinion will not discuss the validity of Claim No. 180 until that issue is properly before the court.

[6] U.S. Bank actually does not request this amount as such.  Instead, the proof of claim itemizes pre- and post-petition interest, together with pre- and post-petition payments received.  The proof of claim notes that these amounts do not include attorneys' fees and costs but reserves the right to request them at a later time.  An analysis shows that U.S. Bank's allowed secured claim for DVI-XVII consisted a principal balance of $1,074,926.89 (the principal of $1.2 million set by the Plan in the First Case, plus interest accrued but less payments received pre-petition), plus accrued unpaid interest of $94,829.00 as of the petition date, and pre-petition fees and costs of $36,928.51.  The claim reflects payments received of $32,450.00.  This is the amount reflected above.

costs, and charges, to which it claims to be entitled under section 506(b),[7] because the value of the collateral securing U.S. Bank's claim, it says, substantially exceeds the amount of its allowed pre-petition claim.

The collateral securing both the DVI-XVII claim and the DVI-XV claims was liquidated in a court-conducted auction on December 12, 2007, pursuant to section 363(f). The sale actually closed on December 21, 2007, yielding $2.8 million. In the course of the auction, DVI-XV agreed to release its lien on the radiology equipment for a stipulated amount of $400,000. Thus, the estate satisfied all of its obligations with respect to DVI-XV with a single payment of $400,000. The court approved that arrangement by order approving an initial motion for distribution of sale proceeds filed by U.S. Bank.[8]

The court order approving the distribution motion also directed the title company to distribute $1,081.929.14 to U.S. Bank on behalf of the DVI-XVII secured claim, in full satisfaction of that entity's outstanding principal balance as of the petition date, plus accrued pre- and post-petition interest on that claim. This arrangement effectively "switched off" the interest clock, though the order also preserved the right of other interested parties (including the Committee) to object to the claim and, if appropriate, seek disgorgement. The order also preserved the issue os whether U.S. Bank could recover attorneys' fees and costs with respect to the DVI-XVII secured claim. U.S. Bank

---

[7] The total amounts claimed under section 506(b) are $20,173.25 for post-petition interest and $72,888.66 for post-petition fees and expenses. Once again, neither the Motion nor the proof of claim request these amounts as such. U.S. Bank instead requested in its first motion $1,081,929.14 as payment of the principal and total interest (both pre- and post-petition). U.S. Bank in the present Motion requests an additional $109,817.17 as pre- and post-petition fees incurred, leaving it entirely to this court to allocate these amounts properly. The total amount requested under section 506(b) is thus $93,061.91. However, as explained below, U.S. Bank has received payment of all pre- and post-petition interest accrued by virtue of this court's order granting its first motion for distributions of sale proceeds.

[8] That provision of the order was not subject to any conditions. The title company thus was required to pay $400,000.00 to DVI-XV for the release of its lien on the radiology equipment.

filed this Motion accordingly.

## POSITION OF THE PARTIES

U.S. Bank, on behalf of DVI-XVII (hereinafter, simply, "U.S. Bank"), contends that, because it is now an over-secured creditor, it is entitled to recover attorneys' fees and costs from the proceeds of the sale. In the First Case, U.S. Bank was an under-secured creditor, with collateral valued at $1.2 million, and emerged from that bankruptcy with a secured claim in that amount. In this Second Case, that claim is now over-secured, says, U.S. Bank, because the collateral was ultimately sold for $2.4 million.[9] Under section 506(b), U.S. Bank concludes, it is entitled to recover its reasonable fees and costs out of those sale proceeds.

Two parties disagree with this logic. G&S 5, L.P. ("G&S"), a party in interest, and the Official Committee of Unsecured Creditors (the "Committee") both argue that U.S. Bank is limited to the payments promised by the debtor under the confirmed Plan from the First Case. Relying on a provision of that Plan, G&S and the Committee contend that the confirmation of the Plan effectively discharged all contractual debts and obligations, including any further obligation to pay attorneys' fees to U.S. Bank. They also maintain that a provision of the Plan affirmatively cut off any further right to claim recovery of fees under non-bankruptcy law.

The debtor, unlike G&S and the Committee, does not tussle with the meaning of the Plan concerning U.S. Bank's right to recover attorneys' fees. The debtor's fracas, instead, concerns: (a) the reasonableness of the hourly rate charged by Palmer & Manuel, LLP ("Palmer & Manuel") in the course of representing U.S. Bank; (b) the nature of the work performed by counsel; and

---

[9] That is, $2.8 million, less the stipulated payment of $400,000 to satisfy the DVI-XV claim (the one secured by the radiology equipment).

(c) the sufficiency of the detail supporting the Motion.  In its objection, the debtor raises issues

which, while not necessarily novel, do merit further discussion and will be addressed later in this

decision.  It is premature to discuss these objections, however, until the court has resolved whether

U.S. Bank is even entitled to recover attorneys' fees and costs under section 506(b).[10]

### Jurisdiction

Because this matter is a core proceeding concerning the distribution of property of the estate,

this court has jurisdiction over this matter and may hear and make final determinations on the merits

of the claims asserted in the Motion.  *See* 28 U.S.C. §§ 157(b); 1334(a), (b), &(e)(1).

### Discussion

Section 506(b) provides the statutory basis for an award of post-petition fees and costs to a

creditor on account of its secured claim:

> To the extent that an allowed secured claim is secured by property the
> value of which . . . is  greater than the amount of such claim, there
> shall be allowed to the holder of such claim, interest on such claim,
> and any reasonable fees, costs, or charges provided for under the
>  agreement or State statute under which such claim arose.

11 U.S.C. § 506(b).  The provision on its face sets up four basic requirements for the allowance of

post-petition attorneys' fees to a secured creditor: (1) the claim must be an allowed secured claim;

(2) the creditor holding the claim must be over-secured; (3) the entitlement to fees must be provided

for under some agreement or state statute; and (4) the fees sought must be reasonable.  *See, e.g.,*

*Kord Enters. II v. Cal. Commerce Bank (In re Kord Enters. II),* 139 F.3d 684, 687 (9th Cir. 1998).

We examine each of these elements below.

---

[10] The court notes that no party has objected to U.S. Bank's claim to post-petition interest, distributions of which were made by the title company pursuant to this court's order of December 20, 2007, granting U.S. Bank's first motion.

1. *U.S. Bank Holds an Allowed Secured Claim.*

For a creditor to hold an "allowed secured claim," it must first hold an allowed claim. *See*

11 U.S.C. § 506(a). Section 101(5) of the Bankruptcy Code defines a "claim" as:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

> (B) right to equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

11 U.S.C. § 101(5). We thus look first to see whether U.S. Bank holds a "right to payment" in this

case. That would normally be a simple exercise — we would look for a note. In this case, however,

another bankruptcy case intervened. We thus need to see how that prior bankruptcy altered U.S.

Bank's "right to payment" in this case.

Originally, there was a note. It was executed in 1998 by Desert Healthcare. The 1998 Note

was later assumed by this debtor (Pan Am) in the course of Desert Healthcare's bankruptcy case.

But Pan Am itself later filed its own bankruptcy case. As of the filing of that case, (which we here

call the "First Case"), U.S. Bank (actually, DVI-XVII, with U.S. Bank as servicer) was owed

$2,696,809.80 on the 1998 Note, secured by land, buildings, and non-leased equipment. The debtor

modified U.S. Bank's right to payment under that 1998 Note by means of a confirmed chapter 11

Plan.

Here is what that Plan did. First, it bifurcated the claim, because (according to the debtor),

the collateral securing the claim was worth less than the amount owed the creditor. *See* 11 U.S.C.

-8-

§ 506(a).  The Plan then treated the secured portion of the claim in one class (Class 4a), and dropped the unsecured portion of the claim into the general class for unsecured claims.[11]  *See* Plan at 16; *see also* 11 U.S.C. §§ 502 & 506(a)(1) ("An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . .").  The Plan set the amount of the allowed secured claim at $1.2 million, the asserted value of the collateral securing the claim.  *See* Plan at 16-18.  No one contested that valuation, and it was ultimately adopted when the court confirmed the Plan.  As a result of this plan treatment, U.S. Bank emerged from the First Case with a "new" right to payment in the amount of $1.2 million (the "New Secured Claim"), secured by land, buildings, and non-leased equipment.  The Plan provided that the New Secured Claim would be satisfied with "level monthly payments of $22,645.48, including interest at 5% per annum, over a term of five years commencing on the first day of the month following [the] confirmation effective date."  Plan at 18.

U.S. Bank did not recover post-petition interest, attorneys' fees and costs in the First Case, because it was under-secured.  That is because there was never sufficient collateral with which to satisfy any of these post-petition accruals, and so they never became part of the allowed secured claim in that case.  *See* 11 U.S.C. § 506(b).  Instead, those accruals were discharged upon confirmation.  *See* 11 U.S.C. § 1141(a), (c).

The Plan in the First Case thus created the "right to payment" that forms the basis for U.S. Bank's claim in this case.  Between confirmation of that Plan, and the filing of this case, the debtor

---

[11] The treatment of the unsecured portion of U.S. Bank's unsecured claim is irrelevant for our purposes here because, upon confirmation, it was treated as an unsecured claim and could not become secured again, no matter what changes occurred with respect to the value of the collateral.  That is the impact of bifurcation.  *See* 11 U.S.C. § 1141.

made certain payments that reduced the claim.  The claim also accrued interest and other charges that increased the claim.  As earlier discussed in this opinion, the amount of the claim, as of the filing of the petition in this case, is approximately[12] $1,174,234.40.

2.  *U.S. Bank Is Over-Secured.*

Whether U.S. Bank is over-secured depends on two factors: what is the amount of the allowed claim, and what is the value of the collateral.  In the previous section, we settled on a number for the allowed claim, for purposes of this decision — $1,174,234.40.  It remains to decide the value of the collateral. We know that a claim is an allowed secured claim to the extent of the value of the collateral securing the claim, and that the valuation is determined "in light of the purpose of the valuation and of the proposed disposition of use of such property."  *See* 11 U.S.C. § 506(a)(1); *see also Landing Assocs., Ltd.*, 122 B.R. 288, 293 (Bankr. W.D. Tex. 1990).  Cases have debated the timing of valuation for section 506(b) purposes.  *See, e.g., Matter of T-H New Orleans, L.P.*, 116 F.3d 790, 797 (5th Cir. 1997) (suggesting that such valuations might be conducted multiple times during a case prior to confirmation of a plan, when the collateral is proposed to be retained by the debtor).  But there is virtually no debate regarding that timing when there has been a court-ordered sale of the collateral under section 363(f).  *See Ford Motor Credit Co. v. Dobbins,* 35 F.3d 860, 870-71 (4th Cir. 1994) ("In sum, when valuing secured collateral to determine whether a creditor is oversecured and thus entitled to post-petition interest pursuant to § 506(b), if the collateral has been sold, the value of the collateral should be based on the consideration received by the estate

---

[12] Recall that the court has made provision for later objections to allowed amount of U.S. Bank's claim.  The court's statement of the amount of the claim in this opinion is not a binding and final determination of the claim.  It is sufficient for purposes of this opinion that the amount is in all events less than the amount of money generated by the sale of the collateral at the court-conducted auction.  *See* discussion *infra*.

-10-

in connection with the sale, provided that the sale price is both fair and the result of an arm's-length transaction."); *see also In re Alpine Group,* 151 B.R. 931, 935-36 (9th Cir. B.A.P. 1993) ("The offered [and accepted] price of $1.9 million is conclusive evidence of the property's value."); *In re Urban Communicators PCS L.P.,* 379 B.R. 232, 242 (Bankr. S.D.N.Y. 2007) (taking the actual sale price as the value of the collateral sold).

In the present case, the value of U.S. Bank's collateral was set by the outcome of the December 12, 2007 auction. In that auction, the collateral was exposed to the market, and the market returned a value twice that attributed to essentially the same property in the First Case: $2.4 million.[13] Because that value is greater than the amount of U.S. Bank's allowed claim as of the petition date, the amount of U.S. Bank's "allowed secured claim," according to section 506(b), may include post-petition accrued reasonable attorneys' fees and costs, up to the value of the collateral.[14] *See* 11 U.S.C. § 506(b).[15] The difference greatly exceeds the amount of post-petition attorneys' fees being sought here.

### 3. *The Agreement Provides for Attorneys' Fees.*

Next, we must see whether there exists an agreement or state statute that provides for the recovery of reasonable fees, costs and charges. That is complicated in this case by the source of U.S. Bank's "right to payment," which is the confirmed Plan from the First Case. *See* discussion *supra.*

---

[13] The final sale price was $2.8 million. DVI-XVII's collateral (the land, building, and all non-leased equipment) *and* DVI-XV's collateral (the leased radiology equipment) were both included in that sale. DVI-XV agreed to accept $400,000 to release its lien. Subtracting this amount for the sale therefore brings a market value of $2.4 million attributed to DVI-XVII's collateral.

[14] It also includes post-petition interest, but there is no debate about interest presented here. By agreement, there has already been a distribution to the DVI Entities in satisfaction of the pre-petition claim and accrued post-petition interest. All that has been reserved here has been the allowance of attorneys' fees (both pre-petition and post-petition).

[15] None of the objecting parties appear to disagree with that proposition, and if they do, they may be judicially estopped by this court's December 20, 2007 order granting U.S. Bank's first motion for distributions.

A natural place to look first for an agreement providing for the recovery of attorneys' fees to a secured creditor is, of course, the note that forms the basis for the right to payment. In this case, however, the 1998 Note that we would first inspect for such a provision is unavailable. It was *replaced* by the Plan. *See* 11 U.S.C. § 1141(a) ("the provisions of a confirmed plan bind the debtor . . . and any creditor . . ."); *see also In re Consumer Realty & Dev. Co.,* 238 B.R. 418, 425-26 (8th Cir. B.A.P. 1999) (noting that the confirmation of a plan had the effect of replacing the obligations under a promissory note with the obligations as provided in the plan); *In re Depew,* 115 B.R. 965, 966 (Bankr. N.D. Ind. 1989) ("Since confirmation binds both debtors and creditors to the terms of a confirmed plan, it effectively replaces debtors' pre-petition obligations to creditors, which were discharged, with the obligations to those creditors set forth in the confirmed plan.") (citing *In re Penn. Iron & Coal Co., Inc.,* 56 B.R. 492, 495 (Bankr. S.D. Ohio 1985) *and In re Am. Props., Inc.,* 30 B.R. 239, 246 (Bankr. D. Kan. 1983)); *Terry v. Federal Ins. Co. (In re R.J. Reynolds-Patrick County Mem. Hospital, Inc.),* 315 B.R. 674, 678 (Bankr. W.D. Va. 2003) (quoting *In re Grinstead,* 75 B.R. 2, 3 (Bankr. D. Minn. 1985)). G&S and the Committee maintain that the treatment of Class 4a does not include any provision for the recovery of attorneys' fees. They also point out that, the source of the creditor's right to recover such fees cannot be the 1998 Note, and so U.S. Bank's claim under section 506(b) must fail. That, they say, is because that note is now gone and thus can no longer be the source of U.S. Bank's right to payment. *See* 11 U.S.C. 506(b) (allowance of fees, costs, and charges conditioned on their being provided for under the agreement); *see also* discussion *supra*. They add that any "right to payment" of attorneys' fees that may have existed with respect to U.S. Bank's claim as it entered the First Case was, of necessity, discharged — regardless whether that

-12-

right to payment had yet matured as a non-contingent or unliquidated indebtedness.[16] *See* 11 U.S.C. § 101(5) (including within the definition of claim, a right to payment that is merely contingent, unliquidated, or unmatured).

The objecting creditors make a valid point. In the sense that a contractual duty to pay attorneys' fees was imposed by the 1998 Note, regardless when the obligation might actually mature into a liquidated claim, it is similar to the kind of dischargeable obligation that arises from a guaranty agreement, which is similarly discharged regardless whether the obligation to pay pursuant to the guaranty has been triggered as of the petition date. *See Jaurdon v. Cricket Commc'ns, Inc.*, 412 F.3d 1156, 1158-59 (10th Cir. 2005) (holding that a creditor who was appealing an unfavorable decision in a previous lawsuit against the debtor held a disputed or contingent claim within the meaning of 101(5)(A) such that the claim was discharged under section 1141(d)(1)(A) when the plan was confirmed, despite the putative creditor's failure to file a timely proof of claim); *see also United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 1005 (2d Cir. 1991).[17]

G&S and the Committee further point to paragraph 12.5 of the Plan, contending that by this

---

[16] It is fair to characterize any contractual provision for the recovery of attorneys' fees as creating a "non-contingent, unliquidated claim" subject to discharge under section 1141.

[17] Said the *Chateaugay Corp.* court:

> The relationship between environmental regulating agencies and those subject to regulation provides sufficient "contemplation" of contingencies to bring most ultimately maturing payment obligations based on pre-petition conduct within the definition of "claims." True, EPA does not yet know the full extent of the hazardous waste removal costs that it may one day incur and seek to impose upon LTV, and it does not yet even know the location of all the sites at which such wastes may yet be found. But the location of these sites, the determination of their coverage by CERCLA, and the incurring of response costs by EPA are all steps that may fairly be viewed, in the regulatory context, as rendering EPA's claim "contingent," rather than as placing it outside the Code's definition of "claim."

*Id.*

provision the Plan actually *eliminated* any future entitlement to recover fees that U.S. Bank could *ever* incur.  The first sentence of that paragraph says, "[b]ecause the statutory effect of confirmation is to discharge permanently all debt which the plan does not propose to repay, any post-confirmation default in the Debtor's performance of the Plan *will not revive any contractual debt or contractual claim in excess of what the Plan proposes to repay.*"  Plan, at ¶ 12.5 (emphasis added).  That sentence restates a statutory fact of life regarding bankruptcy discharge — pre-petition debts are discharged by confirmation, displaced (and replaced) by the Plan's treatment of those debts, and will not be revived by any post-confirmation default in plan payments.  *See* 11 U.S.C. § 1141(d).

Both of these arguments have legs.  A claim — even an unliquidated, or contingent, or an unmatured claim — can be "discharged" by a confirmed chapter 11 plan in the sense that the terms of the plan displace all pre-petition entitlements.  *See* 11 U.S.C. § 1141(a), (c); *see also* discussion *supra*.  And a confirmation order, entered by a federal court pursuant to federal law, can override one's state law entitlements on a going-forward basis as well, to the extent the order is otherwise constitutional.  *See* U.S. Const. art. VI, cl. 2; *see also Pac. Gas & Elec. Co. v. Ca.*, 350 F.3d 932, 948-49 (9th Cir. 2003); *In re Consumers Realty & Devel. Co., Inc.*, 238 B.R. 418, 426 (8th Cir. B.A.P. 1999).[18]

However, these arguments are unavailing if the terms of the Plan itself *do* provide for the

---

[18] G&S and the Committee seem also to argue that, because U.S. Bank was not allowed a claim for attorneys' fees in the First Case (because they were undersecured), they cannot now make any renewed claim for attorneys' fees under section 506(b) in this case.  This argument seems somehow to be grounded on a theory of *res judicata*.  It lacks merit, of course, because the section 506(b) claim made here can only be applied to the claim of the creditor as it stands in this current case.  That U.S. Bank found itself under-secured in the First Case is legally irrelevant to whether it is entitled to a recovery under section 506(b) in *this* case.  Section 506 rests in its entirety on the definition of "allowed claim."  A claim is allowed as of the date of the filing of the petition that initiated *this* case, *see* 11 U.S.C. § 502(b), and claims are filed by creditors, *see* 11 U.S.C. § 501(a).  A creditor is an entity that "has a claim against the debtor that arose *at the time of or before the order for relief concerning the debtor.*"  *See* 11 U.S.C. § 101(10)(A) (emphasis added).  Thus, the allowed claim that we consider in section 506(b) is the claim as it exists in *this case*, not some previous case.

recovery of attorneys' fees with respect to U.S. Bank's claim. The Plan in fact does just that – further down in the very paragraph cited by G&S and the Committee: "[t]he Debtor's failure to make any payment on a secured claim, after twenty-day demand as set forth above, *shall entitle the secured claim holder to exercise ordinary covenants of its security agreement or statutory lien provision according to applicable state law*, to enforce and accelerate the balance of the portion of its claim which was treated as secured at confirmation." Plan, at ¶ 12.5 (emphasis added). By this provision, then, the Plan provides that a secured creditor (like U.S. Bank) may exercise the "ordinary covenants of its security agreement." In so doing, the Plan ratified and incorporated the terms of the Deed of Trust that, by the terms of the Plan itself, continued as security for the New Secured Claim given to DVI-XVII (on whose behalf U.S. Bank now seeks distribution). If this Deed of Trust *also* contains a provision for the recovery of attorneys' fees incident to the New Secured Claim, then U.S. Bank will still be entitled to recover those fees under section 506(b), because Paragraph 12.5 of the Plan preserved U.S. Bank's rights under its security instruments past confirmation. *See* Plan at 18-19, 38. In fact, it does.

Article II of the Deed of Trust granted U.S. Bank a lien on, among other things, the debtor's land and building. *See* Deed of Trust, at 8-9, §§ 2.1(b), 2.3. That lien secured the 1998 Note as well as "[a]ny and all renewals, increases, extensions, *modifications*, rearrangements, or restatements of an supplements to all or any part of the loans . . . described or referred to in subparagraphs (a) through (d) above, *together with all costs, expenses and attorneys' fees incurred in connection with the enforcement or collection thereof*." *Id.* at 8 (emphasis added). The Plan was in essence a modification of the secured obligations under the 1998 Note,[19] and so the New Secured Claim

---

[19] *See In re Consumer Realty & Dev. Co.*, 238 B.R. at 425-26; *In re Depew*, 115 B.R. at 966.

-15-

(arising under the Plan) falls within the Deed of Trust's definition of "Secured Indebtedness." The Deed of Trust further provides U.S. Bank with a broad range of remedies in the event of the debtor's default, including the right to request, and even to force, a judicial sale such as the one this court held on December 12, 2007. *See id.*, art. VI. The Deed of Trust then provides for the recovery of reasonable attorneys' fees relating to the secured party's enforcement of its rights under the Deed of Trust. The Deed of Trust's distribution scheme (for proceeds from the disposition of any collateral described therein) provides for the first distributions to be made as reimbursement for "all expenses of *collection* or of advertising, *selling*, and conveying the [collateral], or any part thereof, *and reasonable attorneys' fees*." *Id.* § 4.6 at 23 (emphasis added).

The Plan, as already noted, incorporates these rights and remedies by reference, and because the Plan is essentially "the agreement" under which U.S. Bank's New Secured Claim arose, the court concludes that the Plan (by ratifying the underlying Deed of Trust) provides the requisite "agreement" for the recovery of post-petition fees called for by section 506(b).

4. *Reasonableness of Fees*

Three of the four elements for allowing U.S. Bank's section 506(b) claim for attorneys' fees have been established, and the objections of G&S and the Committee have been disposed of. It remains to consider whether the fees requested are reasonable. U.S. Bank's Motion actually requests the payment of attorneys' fees incurred not only post-petition (which can be included as part of U.S. Bank's secured claim by virtue of section 506(b) for the reasons outlined above, to the extent they are "reasonable"), but also fees incurred pre-petition as far back as April 2, 2007 (about five months before the petition date in the present case). Pre-petition fees are not governed by section 506(b). Instead, they are rightly included as part of the creditor's pre-petition claim itself, allowed under

-16-

section 502(b). They do not have to pass muster under section 506(b). Instead, they merely need to be allowable under non-bankruptcy law. No one here seriously disputes that U.S. Bank, as a secured creditor has a legal basis for the recovery of pre-petition fees under non-bankruptcy law. TEX.CIV.PRAC.&REM.CODE § 38.001 (Vernon 1997) ("A person may recover reasonable attorneys' fees from an individual or corporation, in addition to the amount of the valid claim and costs, if the claim is for . . . (8) an oral or written contract."). The only limitation we discuss in this opinion is whether, again as a matter of non-bankruptcy law, they are reasonable. This is because, under Texas law (the non-bankruptcy law applicable to this claim), attorneys' fees may be awarded a creditor only to the extent they are reasonable. *See In re Cummins Utility, L.P.,* 279 B.R. 195, 201 (Bankr. N.D. Tex. 2002); *see also In re 900 Corp.,* 327 B.R. 585, 593 (Bankr. N.D. Tex. 2005). Under Texas law, the reasonableness of attorneys' fees are tested by an eight factor approach based on the Texas Rules of Professional Conduct. *See id.; Arthur Andersen & Co. v. Perry Equipment Co.,* 945 S.W.2d 812, 818 (Tex. 1997); *see also* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04, *reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G app. (STATE BAR RULES, art. X, § 9).[20]

Fees incurred *post-petition* are tested for reasonableness under federal law. The Fifth Circuit applies the same standard to professionals employed by secured creditors as it does to professionals employed to represent the estate or an official committee. *See In re Cummins Utility, L.P.,* 279 B.R. at 204 (citing *Blackburn-Bliss Trust v. Hudson Shipbuilders, Inc. (In re Hudson Shipbuilders, Inc.),* 794 F.2d 1051, 1056-57 (5th Cir. 1986)); *see generally Am. Benefit Life Ins. Co. v. Baddock (In re*

---

[20] Those factors are: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent.

*First Colonial Corp. of Am.),* 544 F.2d 1291 (5th Cir. 1977); *Johnson v. Ga. Hwy. Express, Inc.,* 488 F.2d 714 (5th Cir. 1974); 11 U.S.C. §§ 327, 1103.[21]

The Fifth Circuit has instructed bankruptcy judges to follow a three-step process in awarding fees to secured creditors: (1) determine the nature and extent of the services supplied by the attorney with reference to the time and labor records submitted; (2) ascertain the value of the services; and (3) briefly explain the findings and the reasons upon which the award is based.  *In re Hudson Shipbuilders, Inc.,* 794 F.3d at 1058 (citing *In re First Colonial Corp. of Am.,* 544 F.2d at 1299-1300).  In reality, the federal standard for reasonableness under section 506(b) is "virtually identical" to the standard that applies under Texas law in the non-bankruptcy context.  *In re 900 Corp.,* 327 B.R. at 594.  By the same token, it is important to keep in mind the overall purpose of section 506(b) as relevant to the final determination of reasonableness, given that the allowance of fees to a secured creditor come essentially out of the pockets of unsecured creditors.  As Judge Lynn succinctly put it, "Section 506(b) is not intended as a carte blanche for secured creditors to dun the estate."  *In re Cummins Utility, L.P.,* 279 B.R. at 204; *see also In re Center,* 282 B.R. at 567 (noting that the purpose of the reasonableness requirement in section 506(b) is to ensure that over-secured creditors are not merely given a blank check to incur fees at the peril of the estate and its other creditors); *In re 900 Corp.,* 327 B.R. at 593; *In re Sanchez,* 372 B.R. 298, 303-04 (Bankr. S.D. Tex. 2007) (requiring secured creditors seeking reimbursement of attorneys' fees under section 506(b) to submit detailed fee applications, consistent with Bankruptcy Rule 2016).  A court reviewing a secured

---

[21] For the sake of completeness, those factors are:  (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or other circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; (12) awards in similar cases.

creditor's fees for reasonableness should take into consideration, in addition to the *Johnson* factors, the circumstances surrounding the case and the manner of its administration. *See Cummins Utility, L.P.,* 279 B.R. at 204 (quoting *Chase Manhattan Bank, N.A. v. Wonder Corp. of Am. (In re Wonder Corp. of Am.),* 82 B.R. 186, 191 (Bankr. D. Conn. 1988)) (internal quotations omitted). Finally, the court must be especially vigilant to examine whether the secured creditor's attorney has over-staffed the case or double billed for duplicative work. These considerations apply with equal force to both pre-petition and post-petition fee requests.

The court is reminded that, in reviewing the Motion now before the court, the moving secured creditor (here, U.S. Bank) bears the burden of proving the reasonableness of its fees. *See In re 900 Corp.,* 327 B.R. at 595 (citing *In re Atwood,* 293 B.R. 227 (9th Cir. B.A.P. 2003) *and In re White,* 260 B.R. 870 (8th Cir. B.A.P. 2001)); *see also In re Sanchez,* 372 B.R. at 304. Taking the applicable factors into consideration, the court finds U.S. Bank's fees and costs (both pre-petition and post-petition) to be reasonable. Important to this conclusion, as discussed further below, are the circumstances surrounding this case.

This case was this debtor's second filing within the last five years, and the third filing by an owner of the hospital since 1998 when this loan was first created. U.S. Bank has already seen its original claim modified and reduced in the debtor's First Case. It was, therefore, justified in aggressively seeking to protect itself against a further write-down of this indebtedness. U.S. Bank sought, within the limits of the law, to maximize a return and minimize risk of loss. In so advocating, as discussed further below, Palmer & Manuel did not overstaff this case, and its actions have not been overzealous. Instead, the attorneys representing U.S. Bank have sought to protect their client's security interest.

-19-

a) *Pre-Petition Fees and Expenses*

Before the debtor commenced this case, as one can easily deduce from Palmer & Manuel's invoices, U.S. Bank's primary concern was to post the property for foreclosure. With only a few exceptions related to the preparation of the debtor's imminent bankruptcy filing, all of U.S. Bank's fees *were* in fact incurred to Palmer & Manuel in preparation for foreclosure. These services included, among other things, reviewing the bankruptcy papers from the two previous cases, giving the proper notifications under the Plan to notify the debtor of its default, contacting the taxing authorities to determine what liens would have to be satisfied from the sale proceeds, contacting counsel for the debtor to determine whether the sale could proceed,[22] and identifying potential buyers to participate in the event that the posted sale actually proceeded. As early as June, 2007, U.S. Bank was preparing for the possibility that the debtor would commence a new bankruptcy case to forestall the scheduled foreclosure. From this court's review of Palmer & Manuel's supporting documentation, it is clear that U.S. Bank simply was not willing to acquiesce in yet another bankruptcy reorganization, at least not without putting up a fight over the value of the collateral. U.S. Bank, instead, took steps to market the collateral to obtain a value higher even than that attributed to the property by the debtor in the First Case. The services performed in so doing, according to the invoices, fit neatly within the Texas standard for fees reasonably incurred. The court concludes that these fees should be made part of U.S. Bank's allowed claim and paid as such.

b) *Post-Petition Fees and Expenses*

Once the debtor commenced the present case, U.S. Bank began incurring more fees than it

---

[22] It appears from the pre-petition invoices that the debtor did not take the threat of foreclosure lightly, and there were apparently some state court actions to restrain U.S. Bank from proceeding.

had been incurring in the months leading up to the petition date.  But that would not be extraordinary, given that U.S. Bank had been through two recent bankruptcy filings in connection with this hospital, and given the risks attendant to a secured creditor's position in any bankruptcy case.  Once this bankruptcy case began, U.S. Bank's pre-petition goals did not change.  According to the attorney invoices, U.S. Bank continued to move toward posting the property for foreclosure.  Because the debtor was in bankruptcy, however, U.S. Bank had to take additional steps to achieve that goal, and there were more parties involved.  These additional steps included, at least according to the invoices, drafting motions to lift the automatic stay and attacking the debtor's proposed use of cash collateral.

The debtor views these attacks as being overly litigious.  There are certainly circumstances when secured creditors can overstep their bounds and become overly litigious, trying to make the debtor's case unnecessarily difficult, time-consuming, or expensive, and seeking to thwart any and all efforts at rehabilitation.  *See First Bank of Ohio v. Brunswick Apts. of Trumbull County, Ltd. (In re Brunswick Apts. of Trumbull County, Ltd.),* 215 B.R. 520, 524 (6th Cir. B.A.P. 1998) (affirming a bankruptcy court's significantly reduced award of post-petition attorneys' fees under section 506(b), and noting that "most of [the Bank's] effort was unnecessary to protect the Bank's interests, was inconsistent with the Bankruptcy Code, were [sic] unrealistic in terms of the arguments advanced, and otherwise unreasonable"), *aff'd by* 169 F.3d 333, 336 (6th Cir. 1999).[23]  But that was

---

[23] In affirming the lowers courts, the Sixth Circuit added the following note:

> In rejecting these and similar demands by the Bank, *the Bankruptcy Court spoke of the obvious disapproval and 'disdain' or the Chapter 11 process that the Bank exhibited throughout the proceedings.* [] Our review of the record does not disclose a basis for rejecting this view. The Bankruptcy Court concluded that a due regard for and understanding of the purposes of Chapter 11 proceedings would have ended this protracted litigation long ago and that the secured creditor should not be

not the case here.  Considering the secured creditor's experience with this debtor, and the other circumstances surrounding this case,[24] the court cannot agree with the debtor's characterization.  U.S. Bank did not attack the debtor's motion for authority to use cash collateral as a way to pass off attorneys' fees to the estate knowing that it would receive full payment on its claim.  It did not attack the debtor's proposed use of cash collateral simply to be litigious, or obstreperous, or any of a dozen other pejorative adjectives that might come to mind.  It sought to protect itself from further cram down, and it sought to preserve its collateral position in a case which, when it was filed, was fraught with uncertainty.[25]  Just because a secured creditor wishes not to cooperate with the estate does not mean that the fees incurred in taking adversarial measures are not "reasonable."  The Bankruptcy Code does not impose a duty on the secured creditor to surrender protecting its own interests in service to the "greater good" of reorganization.  *See In re Villa Capri of Ga. Assoc. L.P.,* 141 B.R. 257, 263 (Bankr. N.D. Ga. 1992) (noting that, while free to pursue all *bona fide* actions against the debtor, the creditor may seek compensation only for those fees reasonably incurred to protect its interest in its loan) (citing *Midland Mut. Life Ins. Co. v. Masnorth Corp. (In re Masnorth Corp.)*, 36 B.R. 335, 339 (Bankr. N.D. Ga. 1984)).  As noted before, reasonableness within the purview of section 506(b) simply ensures that secured creditors not overstaff or unnecessarily duplicate work

---

rewarded but should be deterred from multiplying the proceedings unnecessarily. This view of the Bank's conduct in pursuing unreasonable claims no doubt colored the proceedings in the courts below.

*Id.* (emphasis added).

[24] As discussed further below, U.S. Bank brought more value to the estate by ensuring that the debtor's prospective buyers were outbid by U.S. Bank's own prospective buyers.

[25] Although the hospital ultimately brought $2.8 million in a court-conducted auction in December, it was far from certain that the debtor's cash flow would support operations on filing, given the level of losses that the hospital was sustaining just shortly before filing.

at the expense of the estate and its other creditors. Judge Lynn once stated that a secured creditor's fees cease to be reasonable once that creditor knew that its claim would be paid in full. *See Cummins Utility, L.P.,* 279 B.R. at 204, 208. Judge Lynn's point is well-taken, but those are not our facts.[26]

In the first month of this case, U.S. Bank's hours increased significantly from a pre-petition average of 25 to 30 hours each month to 95 hours in August alone. But this increase was to be expected for the primary secured lender responding to first day motions and attending hearings on those motions. The fees incurred in the months to follow fell more in line with the pre-petition averages and were also reasonable. Those fees were attributable to U.S. Bank's attempt to obtain relief from the automatic stay (a hotly contested battle), objections to the debtor's motion to sell the collateral under section 363, and continued actions to push for a foreclosure sale outside of bankruptcy.

U.S. Bank's first attempt to obtain relief from the stay resulted in an order that, as it turns out, truly set the tone for this case. After a hearing on September 18, 2007, Judge Robert C. McGuire (then presiding over the case) denied U.S. Bank's motion for relief from the automatic stay, but subject to conditions. His order included a provision that amounted to a drop-dead date for the automatic stay. The order gave the debtor less than three months (until December 7, 2007) to obtain new financing or to find a willing buyer. Failure to do so by December 7, 2007 meant the termination of the automatic stay as to U.S. Bank and the inevitable foreclosure thereafter. [Dkt. #

---

[26] If the debtor seeks to rely on *Cummins* for the proposition that U.S. Bank should have stopped incurring fees once it became aware that it was fully secured, the debtor should have demonstrated precisely when U.S. Bank first became aware that it was over-secured. Until the in-court auction, there was a moderate amount of uncertainty regarding the value of the debtor's business and its assets, including U.S. Bank's collateral. *See supra* note 22 and accompanying text.

154].  With this carrot, U.S. Bank tracked along, so the invoices reveal, to an imminent December foreclosure.  All that was left to do until December 7, 2007 was to monitor the case, with U.S. Bank acting to protect itself against further incursions on its cash collateral and making sure that its secured position would be protected in the event of a section 363 sale.

Not only do Palmer & Manuel's invoices reflect this work, but they also reflect that Palmer & Manuel did this without overstaffing the case and without the excessive billing that one would expect to be present were this case problematic.[27]

The debtor attempted to market the hospital and searched for potential buyers to purchase its property through a section 363 sale, but to no avail.  Its first attempt collapsed when the stalking horse bidder backed out before this court could approve the debtor's proposed sale procedures.  It was not until just the week before the December 7, 2007 drop dead date that the debtor returned with another potential stalking horse bidder and requested an eleventh hour extension of the drop dead date to allow a section 363 sale to go forward.  U.S. Bank objected and argued that it had found prospective buyers of its own, and was prepared to go forward with its foreclosure sale.  At a hearing on the debtor's motion to extend the stay and to approve new section 363 sale procedures, this court determined that all parties would be better off if this court held an in-court auction in lieu of either foreclosure or the bid procedure being proposed by the debtor.  When U.S. Bank contended that its prospective buyers did not wish to be disclosed, this court advised both the debtor and U.S. Bank to notify their prospective buyers of the in-court auction in lieu of the foreclosure sale, with the

---

[27] After the first month of this case, Palmer & Manuel billed 35.1 hours in September, 42.0 hours in October, 26.75 hours in November, and 56.95 hours in December (the month of the auction and sale closing).  With the fight U.S. Bank had on its hands, a bigger firm may have billed these hours in single a week.  And despite the debtor's contention that U.S. Bank knew all along that it was over-secured, one cannot blame U.S. Bank for duke-ing out this issue until the in-court auction produced a final sale price of $2.8 million.  Until that time, there was no such guarantee.

-24-

warning that the property would of a certainty be sold on that date to whomever showed up, at an open-call auction conducted by the judge in the courtroom.

The auction was in fact held in court on December 12, 2007. The debtor's newly proposed stalking horse bidders were present, as were at least some of U.S. Bank's prospective buyers. The opening bid was $1.5 million, offered by a bidder which U.S. Bank says was one of its prospective buyers. When given an opportunity to offer a counter, the debtor's new stalking horse bidder declined.[28] The winning bid, while not offered by U.S. Bank's prospective buyer, was $2.8 million. That bid came after several incremental bids between the ultimate purchaser and U.S. Bank's prospective buyer. Once again, Palmer & Manuel's invoices track this history and demonstrate that U.S. Bank was, prior to time the court ordered an auction to be held, in fact working with prospective buyers to achieve a successful sale via the foreclosure process. Without U.S. Bank's objection to the debtor's latest sale procedures and its insistence that it could bring in a higher sale price outside of bankruptcy, the court might never have decided to hold an auction, and the estate might not have received the final bid of $2.8 million that has happily resulted in making U.S. Bank an over-secured creditor in this case. Palmer & Manuel has thus provided value to the estate, albeit somewhat by accident.

Following the December 12, 2007 auction, Palmer & Manuel's workload reduced considerably. The only post-auction work left to do was to work with the other parties on a form of the sale order (as this court requested), to upload a proof of claim with the final calculation of the principal balance owed on U.S. Bank's New Secured Claim, and to file a motion for distribution of

---

[28] In fact, the debtor's putative stalking horse bidder did not further participate in the bidding at all. The debtor's last attempt to obtain approval of its sale procedures proposed a stalking horse bid well below the $1.5 million opening auction bid.

the sale proceeds.  In light of the history of U.S. Bank's relationship with the debtor, the court finds

the fees incurred during this process to be reasonable.[29]  U.S. Bank was not fighting with the debtor

for the sake of being litigious.  Palmer & Manuel was merely taking steps to ensure the highest

possible value from the disposition of the bank's collateral.  After seeing a $3 million claim reduced

to $1.2 million dollars less than two years earlier, one can understand U.S. Bank's position.  In light

of all of these circumstances, the court finds U.S. Bank's post-petition fees and expenses to be

reasonable under section 506(b).  Because the debtor has raised a few specific issues, however, the

court will address those issues in turn.

### i. *Multiple Attorneys and Possible Duplications*

The debtor contends that Palmer & Manuel unreasonably allocated two attorneys' time to

U.S. Bank's file.[30]  This court is in no position to dictate which or how many attorneys a law firm

may allocate to a particular matter.  The way this court sees it, a firm may allocate as many attorneys

to a particular matter as it considers to be in the best interest of its client.  Only when the attorneys

begin to duplicate work unnecessarily do the fees threaten to become unreasonable.  And a risk that

a law firm runs by allocating multiple attorneys to a given matter is that those attorneys may need

to confer with one another during the course of their representation to ensure that all attorneys are

on the same page, as it were.  Intra-firm conferences, while a good idea in general, may lead to

unreasonable fees, or at least, unnecessarily duplicative time billed to the estate, particularly where

the firm fails to explain the need for those conferences.  *See, e.g., In re 900 Corp.,* 327 B.R. at 597

---

[29] That is to say, U.S. Bank was justified in seeing the sale through.

[30] The two Palmer & Manuel attorneys are Martin J. Lehman and Alan S. Leibel.  Each attorney has over 25 years of experience in real estate transactions, litigation, and other bankruptcy related matters.

(disallowing some of the attorneys' time allocated to intra-office conferences without explaining why the conferences were necessary). This court sees no instances in the invoices where Mr. Lehman and Mr. Leibel billed for intra-office conferences. And, despite the debtor's argument to the contrary, having two attorneys kept apprised of the case may prove to be beneficial to all parties in some circumstances — *e.g.,* when one attorney is suddenly unavailable due to unforeseen circumstances.[31] In all events, there is no evidence of over-lawyering nor does the court find any evidence of unnecessary duplication of work in this case.

### ii. *Community Standards of Rates*

The debtor also complains that Palmer & Manuel charged an unreasonable hourly rate compared to other attorneys in the forum where this bankruptcy case is pending. In so arguing, the debtor raises the issue of how to define "community standards" — that is, whether the reasonable hourly rates within one city may govern what may be considered reasonable where the applicant maintains its practice in a different city. One can imagine a scenario in which the reasonableness of the rate according to El Paso standards may differ significantly from the standards of reasonableness where the applicant's law firm is located. In this case, however, the debtor presented

---

[31] Indeed, Mr. Lehman *was* unable to attend the hearing on this Motion on April 3, 2008. Mr. Leibel appeared in his stead and was well-prepared to represent U.S. Bank and his firm. The debtor also argued that all work billed by Mr. Leibel was related to DVI-XV's claim and therefore should not have been included in DVI-XVII's claim. But as it turns out, that simply was not the case. Based on Mr. Leibel's representations on the record and the invoices attached to the Motion, the court is satisfied that Palmer & Manuel kept separate records for each client's file. The fees requested in the Motion pertain only to DVI-XVII's claim. The court recognizes that a few line-items in the invoices mention leased equipment (DVI-XV's collateral), in addition to those few instances where Palmer & Manuel inadvertently billed DVI-XVII's file for DVI-XV matters. It would be absurd to expect the primary secured lender to dispose of its collateral without taking into consideration the disposition of property that does not serve as collateral. With the exception of the three items which Palmer & Manuel has voluntarily removed from its fee request, the court finds the remaining items which one may consider to be billable to DVI-XV were reasonably billed to DVI-XVII and may be included in the present Motion.

expert testimony that the average fee he would expect to see in El Paso is $250 per hour.[32]  Palmer & Manuel, located in Dallas, Texas, bills both of the attorneys who worked on this engagement at an hourly rate of $300.

This court has observed in an earlier decision that "[m]any bankruptcy cases are often more regional or even national than they are local in scope, so that looking solely to the local community's range of rates would impose an unnecessarily parochial cap on the case." *In re Temple Retirement Community, Inc.,* 97 B.R. 333, 342 (Bankr. W.D.Tex. 1989); *see also In re El Paso Refinery, L.P.,* 257 B.R. 809, 832 (Bankr. W.D.Tex. 2000).  That observation is still valid, but it is harder today to say what the scope of a case really is, because even an otherwise local case in terms of employees or business operation may be a regional case in terms of its lenders.  Courts should exercise some care before denying a given player their chosen choice of counsel based solely on the location (and billing rate) of the lawyer, and imposing local rates can have just that effect.[33]

The court sees no reason to impose a duty on the client in this case to limit its choice of counsel to a given locality when the counsel of choice is charging rates that would be reasonable even by El Paso standards. In this case, Mr. Lehman and Mr. Leibel each charge a rate only $50 per

---

[32] "No expert testimony was required as to the current hourly rates for attorneys since the bankruptcy and district courts are already very familiar with prevailing community standards." *In re Lawler,* 807 F.2d 1207, 1212 (5th Cir. 1987).  "For a bankruptcy judge, that familiarity often extends beyond the city in which the case is pending." *In re El Paso Refinery, L.P.,* 257 B.R. 809, 832 (Bankr. W.D. Tex. 2000).

[33] The proper definition for the community standard of reasonableness has evaded this court for decades. *See In re Temple Retirement Community, Inc.,* 97 B.R. at 342 *and In re El Paso Refinery, L.P.,* 257 B.R. at 832.  One can imagine a case in which one might be compelled to draw the line. Suppose, for example, U.S. Bank chose, as its counsel in this case, a London-based firm whose solicitors average an hourly billing rate in excess of $2,000.  At that point, it seems the court would be justified in asking whether the resulting fees would be "reasonable," given how out of step such a billing rate would be in El Paso for a relatively localized (and relatively uncomplicated) engagement.  But what if, instead, the firm was based in New York? Houston? Corpus Christi?  The difficulty of principled line-drawing quickly becomes apparent.  Fortunately, the facts of this case save us from having to further explore the issue.

hour more than the debtor's expert testified to be the average billing rate in the El Paso community. The rates are reasonable.

### iii. *Sufficiency of Fee Detail*

The debtor next complains of the sufficiency of the detail in the supporting fee invoices attached to the Motion.  The court, however, finds the detail provided to be sufficient.  Neither Texas law nor the Bankruptcy Code specifies the amount of detail required in a fee application.  Most courts require billing in increments of tenths of an hour.  It appears that Palmer & Manuel has billed in tenths of hours and, in some cases, even twentieths.  The purpose of these rules are not for the sake of imposing an artificial rule.  As it is U.S. Bank's burden of proving the reasonableness of its attorneys' fees, Palmer & Manuel is free to provide whatever level of detail it deems necessary to satisfy its burden.  So long as the court has a sufficient amount of evidence to evaluate the reasonableness of the fees requested, the attorneys need not do more.  Upon review of Palmer & Manuel's fee invoices, the court feels comfortable with their sufficiency.

True, many pages contain redactions.  But some redactions are necessary to protect confidentiality or privilege.  Even if we ignore the redactions, the detail that remains clearly explains what services the attorneys were performing.  The vast majority of the fees were incurred in the process of exercising U.S. Bank's rights upon the debtor's default.  It is clear from the fee invoices that U.S. Bank took steps to demand payment, to accelerate the balance due, and to hold a foreclosure sale of the property.  As early as April 2007, the invoices make clear that U.S. Bank was prepared to put up a fight if the debtor filed another bankruptcy.[34]  In light of the circumstances, the

---

[34] U.S. Bank's attorneys spent a considerable amount of time (about five hours in April) reviewing the documents from the two previous bankruptcy cases.

court finds these fees to be reasonable.  No further detail was necessary.

It is also true that the invoices attached to the Motion contain blocks of tasks with a "lumped" time performed rather than sub-totals for each task within the blocks.  It is both helpful and convenient for the reviewing court when professionals break up the blocks by allocating time to each task within the block.  Some courts even impose rules or "guidelines" requiring that practice. "When time entries are vague or lumped together, such that the Court cannot determine how much time was spent on particular services, then the creditor has not met its burden to show that its fees are reasonable." *In re 900 Corp.*, 327 B.R. at 598 (citations omitted).  When blocks are relatively small, however, and when the total time spent on the block as a whole is minimal, allocating time to each task loses its convenience and utility.  A prime example of this is in a block found in Palmer & Manuel's Invoice No. 2296 (June 4, 2007):

> Draft correspondence to Tricia Verkinderen regarding [redacted];
> Draft correspondence to Bill Garner; Jim Depeteris and Russell
> Norment; Receipt and review of bond receipt; Draft correspondence
> to Garner and Depetris regarding foreclosure sale; Draft
> correspondence to Tricia Verkinderen regarding [redacted].

Exhibit to the Motion, Invoice No. 2296.  In that entry, Palmer & Manual is guilty of "lumping." The entry lacks the line-by-line time allocation for each task within the block.  But that entire entry totals only 0.80 hours.  Requiring an itemized allocation within such an insignificant block would be overly technical and would be enforcing a rule merely for the sake of enforcement.  The court will not require a professional to allocate a time for each keystroke or thought.  The debtor's objection begins to approach that standard.  We must remember the purpose of the fee detail — to allow the court to evaluate the reasonableness of the requested fee.  So long as the detail provided is sufficient for the court to make that determination, that is enough.  The creditor submits fee applications at its

-30-

own risk.  The less detail provided, the more difficult it will be for the court to decipher whether the

fees requested are reasonable.  In that case, the applying party risks its fee award being delayed,

reduced, or even denied.  The invoices here do not reach that point.  Palmer & Manuel may want to

reconsider the level of detail it includes in future fee invoices.  But, contrary to the debtor's

contention, the lack of detail itself does not make the fees unreasonable. This court is well aware of

the circumstances surrounding this case.  Based on a review of the invoices within that context, the

court concludes that the services performed and the time allocated were reasonable.[35]  For the

foregoing reasons, the court finds the fees incurred by Palmer & Manuel during the course of this

case and the few months prior to the commencement of this case to be reasonable.

### CONCLUSION

The chapter 11 plan of reorganization which was confirmed in the debtor's previous case

effectively granted U.S. Bank a new secured claim but incorporated the pre-existing security

agreement in that claim.  Thus, for the purposes of this case, the court must separately analyze U.S.

Bank's secured status in this case under section 506(b), taking into account this new claim and the

potential change in value of the collateral since the previous case.  Because the collateral securing

U.S. Bank's claim was sold through an in-court auction for a price above the value of U.S. Bank's

---

[35] Of the many pages and entries attached to U.S. Bank's Motion, only one "lumped" entry catches this court's attention.  On September 18, 2007, Mr. Lehman spent nine hours traveling to and from El Paso for a hearing on a motion to lift the automatic stay.  The other items in that block indicate that Mr. Lehman also prepared for and participated in that hearing and also discussed matters with an attorney representing one of the debtor's tenants.  *See* Exhibit to the Motion, Invoice No. 3015.  While there is insufficient detail to determine how much time was spent on each of these items, the court can still determine that Mr. Lehman's time allocation was reasonable in light of the circumstances surrounding that motion and that hearing.  As discussed above, that preparation resulted in a drop-dead date for the termination of the automatic stay and for the out-of-bankruptcy foreclosure to go forward.  One can only imagine the preparation and arguments required to obtain that sort of unusual relief.  Discussions with the debtor's tenant would be necessary as well if U.S. Bank were to sell the hospital through a state foreclosure proceeding.  In light of these circumstances, the court finds this block to be reasonable.  All other lumped blocks are similarly sufficient to allow this court to determine the reasonableness of the services performed and the time allocated to those services.

new claim, U.S. Bank has an allowed secured claim, and that claim is secured by collateral with a greater value than the claim itself.  In other words, U.S. Bank is over-secured in this case.  U.S. Bank's rights under the security agreement were incorporated into the plan of reorganization, and so the agreement giving rise to the claim provides for attorneys's fees.  The court finds those fees to be reasonable under the standards applied by Texas law (for the pre-petition fees) and federal law (for the post-petition fees).  The court therefore will grant the Motion and overrule the objections thereto.  The court will issue a separate order consistent with this decision.

# # #